IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


KENSINGTON VOLUNTEER         *
FIRE DEPARTMENT, INC., et al.,    *
                                 *
                                 *
       v.                 *     Civil Case No. JFM-11-273
                                 *
                                 *
MONTGOMERY COUNTY, et. al.,    *
                                 *
                                 *****


MEMORANDUM


      Plaintiffs in this case, a collection of local volunteer fire and rescue departments[1] and

several of their former administrative employees[2] (collectively, "Plaintiffs"), have filed this

action against defendants Montgomery County and certain county officials[3] (collectively,

"Defendants") under various federal and state statutory and constitutional provisions.  Plaintiffs

seek injunctive relief, declaratory judgment, and damages for Defendants' elimination of public

funding for certain administrative support positions at the local volunteer fire departments,

allegedly in retaliation for Plaintiffs' opposition to a piece of legislation favored by Defendants.

---

[1] The LFRD plaintiffs in this case are as follows: Kensington Volunteer Fire Department ("KVFD"), Cabin John Park Volunteer Fire Department ("CJPVFD"), Hyattstown Volunteer Fire Department, Inc. ("HVFD"), the Bethesda Fire Department, Inc. ("BFD").

[2] The individual plaintiffs identified in the First Amended Complaint are as follows: Paula Mackel, Janeth Mora, Augustine M. Kelly, and Shawn St. Claire.  Additionally, pursuant to Rule 24(b)(1)(B), I granted motions to intervene as plaintiffs filed by three other former LFRD administrative employees, Steven Kurtz, Deborah Rokes, and Stephanie Ayton, because their claims share common questions of law or fact with the main action.

[3] Isiah Leggett ("Leggett"), County Executive of Montgomery County, and Richard Bowers ("Bowers"), Fire Chief and Director of the Montgomery County Fire and Rescue Services, are named as defendants as to all counts in the First Amended Complaint.  Joseph Adler ("Adler"), Director of the County's Office of Human Resources, and Joseph Beach ("Beach"), Director of the County's Office of Management and Budget, are named as defendants as to Counts I and V only.

Defendants now move to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) or, alternatively, for summary judgment pursuant to Rule 56.  For the reasons stated below, Defendants' Motion to Dismiss is granted.

FACTUAL AND PROCEDURAL BACKGROUND

The following facts are uncontroverted or set forth in the light most favorable to the plaintiff.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The Montgomery County Fire and Rescue Service ("MCFRS") is operated by both the County and a collection of independent local fire and rescue departments ("LFRDs"), which provide "fire, rescue and emergency medical services in conjunction with County employees in the Fire and Rescue Service."  Code of Montgomery County Regulations ("COMCOR") § 21-1(a); § 2-39A(b).  Although each LFRD is an independent corporation under Maryland law, the County has traditionally allocated public monies to fund administrative support positions at the LFRDs, including the positions formerly held by the individual Plaintiffs in this case.  (First Am. Compl. ¶ 8.)  Notwithstanding the public funding for these positions, however, the County Code of Regulations states that these administrative personnel are still considered employees of the individual LFRDs, not the County.  *See* COMCOR § 21-16(a) ("Employees of local fire and rescue departments who are paid with tax funds are not County employees."); *see also* COMCOR § 21-16(c) ("Nothing in this Chapter means that employees of the local fire and rescue departments are County employees, either on a *de jure* or *de facto* basis.").

In May 2010, the County Council passed Budget Resolution 16-373 approving the budget for fiscal year 2011.  Out of a total operating budget of approximately $1.16 billion, the County Council allocated approximately $1.58 million for the personnel costs of the LFRDs.  (Budget Resolution No. 16-373: FY 2011 Operating Budget, Defs.' Ex. C, at 5-25.)  Among other things,

these monies were slated to be used to fund a total of twenty administrative support positions at various LFRDs.   Additionally, Budget Resolution 16-373 contained a provision stating that all budget appropriations were contingent upon a requirement that the County Executive "transmit to the Council any recommended budget savings plan or similar action" for review and approval by the Council.  (Budget Resolution No. 16-373, Defs.' Ex. C, at 5-14.)

As 2010 wore on, the County determined that, consistent with Resolution 16-373, it would need to implement a budget savings plan for FY 2011.[4]  Specifically, the County sought to offset the loss of revenue caused by the anticipated defeat of Bill 13-10, a piece of legislation which authorized the imposition of an Emergency Medical Services Transport fee ("EMST fee"). The EMST fee was projected to generate $14.1 million annually in revenue, and the County Council had incorporated this expected revenue into its FY 2011 budget plan.  However, Bill 13-10 encountered fierce opposition after its proposal, and a petition campaign succeeded in subjecting it to a referendum vote on the November 2010 ballot, which would later succeed in defeating the bill.  The LFRDs and other volunteer groups were particularly active in their opposition to Bill 13-10, and Plaintiffs allege that "[v]olunteer opposition to the [EMST] fee was widely publicized throughout Montgomery County, and beyond."  (First Am. Compl. ¶ 22.) Prior to the referendum vote—but after recognizing that the ballot measure to defeat the EMST fee would "most likely succeed"—County Executive Isiah Leggett ("Leggett") sent a budget savings plan proposal to the County Council in an effort "to address the potential loss of

---

[4] The implementation of a mid-year budget savings plan is not an uncommon occurrence in Montgomery County.  Plaintiffs' exhibits reveal that the County Council and the County Executive had "frequently collaborated on mid-year savings plans of this kind" in prior years. (Pls.' Ex. 11, Mem. to County Council, at 1.)  In fiscal years 2008, 2009, and 2010, for example, the County Council approved mid-year savings plans of $33.2 million, $33.0 million, and $99.4 million, respectively.  (*Id.*)

revenue" caused by the expected defeat of the bill. (Pls.' Ex. 6, FY11 Savings Plan Proposal, at 1.)

Leggett's savings plan proposal called for $14.3 million in spending cuts and the elimination of 133 publicly funded positions. (Pls.' Ex. 6, FY11 Savings Plan Proposal.) These proposed cutbacks affected a wide range of departments and services, including the MCFRS, the Department of Transportation, the Police Department, the Department of General Services, the Department of Recreation, the Public Libraries, and the Department of Health and Human Services. (*Id.*) Most pertinent to the instant suit, however, was a recommendation to "discontinue funding 20 LFRD civilian employees," at a savings of $592,000, and to offset their workload by creating five new administrative positions with the County. (*Id.*) The proposal did not recommend cutting funding for any non-volunteer administrative support positions within MCFRS, and Plaintiffs assert that LFRD funding cuts were made "solely for the purpose of punishing, and retaliating against, the LFRDs" for their opposition to the EMST fee. (First Am. Compl. ¶ 17.)

Less than two months later, on December 2, 2010, Leggett submitted to the County Council a second savings plan for FY 2011 proposing "additional reductions" in an effort to close the gap on a projected $300 million budget shortfall for FY 2012. (Pls.' Ex. 4, FY11 Revised Savings Plan Proposal, at 1.) In a cover letter accompanying this proposal, Leggett explained that further budget cuts were necessary because "tax revenues in both FY11 and FY12 are anticipated to be below previous estimates" in light of the "continued weakness in the national, regional and local economy." (*Id.*) The revised savings plan called for even deeper reductions and proposed $36 million in budget cuts from a range of agencies. The revised plan

contained no additional LFRD budget reductions, but it did retain the earlier proposal to eliminate funding for twenty LFRD administrative positions. (*Id.*)

This revised savings plan was discussed at a session of the County Council on December 14, 2010. Plaintiffs contend that in testimony before the Council, Fire Chief Richard Bowers ("Bowers") spoke in support of the proposal and "promoted the impression that the Council's choices [for funding priorities] lay between 'boots on the ground' and administrative personnel that readily could be supplanted by MCFRS operational personnel." (First Am. Compl. ¶ 20.) Plaintiffs also emphasize that during the session of the Council, Councilmember Elrich appeared to blame the LFRDs for the defeat of the EMST fee and the subsequent budget crunch, and he stated that he thought LFRD budgets should be cut even further than called for by the savings plan.[5] (*Id.* ¶ 19.) Meanwhile, another councilmember assailed the proposal for having a "disproportionate hit on the volunteers." (*Id.* ¶ 21.) In the end, however, the County Council passed Budget Resolution 17-17 and thereby authorized reductions of $32,249,170 from the FY 2011 operating budget. (Pls.' Ex. 7, Budget Resolution No. 17-17: FY 2011 Savings Plan.) Of this total figure, approximately $592,000, or about 1.8%, would have been used to fund the twenty LFRD administrative support positions. (*Id.*)

Two days after the passage of the savings plan, Bowers sent a letter to each LFRD stating that as of the end of the year, "LFRD employees will no longer by paid by Montgomery County." (Bowers Letter, Pls.' Ex. 3.) The letter went on to explain that each LFRD "must immediately determine if the LFRD will retain your employee or effect a Reduction in Force

---

[5] Councilmember Elrich's exact statement reads as follows: "I wish there frankly were more cuts to the volunteer side of the fire service because we wouldn't be niggling over these, you know, few little hundred thousand dollars here and hundred thousand dollars there if we had twelve more million dollars in the budget. And we don't have proposals for deeper cuts where I think we ought to make deeper cuts." (First Am. Compl. ¶ 19.)

(RIF)." (*Id.*) The letter further encouraged the LFRDs to "reference Section 30 Montgomery County Personnel Regulations ["MCPR"] to process a RIF, if your LFRD elects to take this course of action." (*Id.*) Soon thereafter, each of the plaintiff LFRDs notified its administrative employees that it would be conducting a RIF pursuant to section 30 of the MCPR and terminating their administrative positions. (*See, e.g.*, KVFD Termination Letter, Defs.' Ex. L.)

Given the LFRDs' active and well-publicized opposition to Bill 13-10, Plaintiffs assert that Defendants eliminated funding for the LFRD administrative positions "as retaliation for Plaintiffs' exercise of legally protected rights in having opposed ambulance fee legislation." (First Am. Compl. at 4.) Plaintiffs filed this action on January 4, 2011 in state court alleging five counts[6] and seeking injunctive and declaratory relief as well as damages. Specifically, Plaintiffs allege that Defendants actions violate the First Amendment of the United States Constitution, Article 40 of the Maryland Declaration of Rights, 42 U.S.C. § 1983, Maryland's common law ban on abusive discharge, and various County personnel regulations. (First Am. Compl. ¶ 38.) On February 1, 2011, Defendants removed the case to this Court pursuant to 28 U.S.C. § 1331 because of federal questions presented by the pleadings. Defendants filed the instant motion to dismiss and/or for summary judgment on February 4, 2011. On March 23, 2011, upon consent of Defendants, Plaintiffs filed an amended complaint adding several additional plaintiffs and dismissing the County Council as a defendant. The parties stipulated that Defendants' pending Motion to Dismiss and/or for Summary Judgment would be applicable to and binding upon all

---

[6] Count One seeks an immediate injunction prohibiting the defunding of the LFRD administrative positions. (First Am. Compl. ¶¶ 36-39.) Count Two alleges a violation of 42 U.S.C. § 1983. (*Id.* ¶¶ 40-41.) Count Three alleges an abusive discharge claim under Maryland common law. (*Id.* ¶¶ 42-43.) Count Four alleges violations of the First Amendment of the United States Constitution and Article 40 of the Maryland Declaration of Rights. (*Id.* ¶¶ 44-45.) Count Five seeks a writ of mandamus compelling Defendants to comply with the reduction in force requirements set forth in the Montgomery County Personnel Regulations ("MCPR"). (*Id.* ¶¶ 46-47.)

parties and claims, old and new.  (Stipulation Regarding Plaintiffs' Filing of Amended Verified

Complaint, Mar. 22, 2011, ECF No. 22 at 2.)

ANALYSIS

I.       Standard of Review

As permitted by Federal Rule of Civil Procedure 12(d), Defendants seek dismissal

pursuant to Rule 12(b)(6) or, in the alternative, summary judgment pursuant to Rule 56.  Because

I need not consider matters outside the pleadings in resolving this motion, I will treat

Defendants' Motion as a Rule 12(b)(6) motion to dismiss.  When considering such a motion,

courts must "accept the well-pled allegations of the complaint as true" and "construe the facts

and reasonable inferences derived therefrom in the light most favorable to the plaintiff."  *Ibarra

v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  Courts may also consider any documents

attached to the complaint, "as well as those attached to the motion to dismiss, so long as they are

integral to the complaint and authentic."  *Phillips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180

(4th Cir. 2009).  Courts need not, however, accept unsupported legal allegations or legal

conclusions couched as factual allegations.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).  To

survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a

right to relief above the speculative level . . . on the assumption that all the allegations in the

complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (internal citations omitted).  Thus, the plaintiff's obligation is to set forth sufficiently the

"grounds of his entitlement to relief," offering more than "labels and conclusions."  *Id*.

II.      First Amendment and Article 40 Claims

Count IV charges that the alleged retaliatory defunding of the LFRD's administrative

support positions violates Plaintiffs' rights to free speech and freedom of association under the

First Amendment to the United States Constitution and under Article 40 of the Maryland

Declaration of Rights.[7] Count II alleges that because Defendants were acting under color of state

law, this same alleged deprivation also gives rise to a violation of 42 U.S.C. § 1983. For the

reasons that follow, these counts are dismissed. Additionally, Count I is dismissed to the extent

that it incorporates First Amendment and Article 40 claims in its application for injunctive and

declaratory relief.

A.   *Alleged Illicit Legislative Motive*

Plaintiffs do not dispute that the budget savings plan is a facially valid piece of

legislation. Instead, Plaintiffs assert that they were unconstitutionally targeted by the savings

plan, including the funding cuts to the LFRD personnel budget, solely as retaliation for their

opposition to the proposed EMST fee. Necessarily, such an allegation requires an examination

of Defendants' motives in enacting the savings plan. Defendants, however, maintain that in

cases such as this one, where a plaintiff challenges a facially valid statute of general

applicability, courts cannot look to legislative motive to demonstrate a violation of the First

Amendment. Defendants are correct, and for that reason Plaintiffs fail to state a claim under the

First Amendment and Article 40.

In *United States v. O'Brien*, 391 U.S. 367 (1968), the Supreme Court reaffirmed the

"familiar principle of constitutional law that this Court will not strike down an otherwise

constitutional statute on the basis of an alleged illicit legislative motive." *Id.* at 383. The

plaintiff in that case had argued that a law banning the burning of draft cards was

unconstitutional because Congress' purpose in enacting it—as evidenced by the statements of

three individual Congressmen—was to punish draft protesters and thereby suppress freedom of

---

[7] Article 40 is treated as "co-extensive" with the First Amendment, and it is construed *in pari materia* with it. *Newell v. Runnels*, 967 A.2d 729, 743 n.11 (Md. 2009).

speech.  *Id.* at 385.  The Court, however, explained that although legislative motives may properly be considered when the task is to interpret a statute, "[i]t is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it."  *Id.* at 383.  In such a case, "inquiries into congressional motives or purposes are a hazardous matter" because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it."  *Id.* at 383-84.  Thus, notwithstanding the apparent desire of several legislators to punish expressive conduct, the Court held that because the statute was facially constitutional, it would not invalidate it on the basis of the allegedly illicit legislative motive.

The Fourth Circuit has faithfully applied the *O'Brien* rule in its own decisions.  For example, in *D.G. Restaurant Corp. v. City of Myrtle Beach*, 953 F.2d 140 (4th Cir. 1991), the court considered a challenge to a zoning ordinance prohibiting businesses from offering topless dancing within 500 feet of certain areas.   The court rejected the plaintiff's argument that the true motive of the city legislators was to restrict protected expression: "[T]he individual motives of legislators . . . are rarely relevant to a court's consideration of the legitimacy of the legislation.  For good reason, courts have not as a general rule found legislation unconstitutional based on the motive of the voting legislators when the legislation is facially constitutional."  *Id.* at 146; *see also McDoogal's East, Inc. v. Cnty. Comm'rs of Caroline Cnty.*, 341 F. App'x 918, 924 (4th Cir. 2009) ("[A] court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.").

The teaching of *O'Brien* also applies with full force to First Amendment challenges based on alleged political retaliation.  *Fraternal Order of Police Hobart Lodge #121, Inc. v. City of Hobart*, 864 F.2d 551 (7th Cir. 1988), a case involving facts strikingly similar to those

presented by this suit, serves as a particularly illustrative example. In that case, the city of

Hobart's mayor and city council lost a primary election when the city's police force actively

supported the opposition candidate. After the primary election—but before leaving office—the

lame-duck mayor and council passed a law requiring all city employees to work 40-hour weeks.

*Id.* at 553. The law did not have an appreciable effect on most city employees, who already

worked a regular five-day week, but it did affect the town's police officers, whose idiosyncratic

schedule called for less than 40 hours per week. The Hobart police union and several of its

members alleged that the new law was retaliation for their support of the opposition candidate in

the primary election, and they brought a § 1983 action against the mayor and others alleging

First Amendment violations. *Id.*

As an initial matter, the *Hobart* court accepted as true the complaint's allegation that "the

only motive for the enactment of the ordinance was to punish the police for having opposed . . .

the very officials who enacted the ordinance." *Id.* at 554. Furthermore, the court noted that the

council members had failed to invoke their legislative immunity in the district court and

therefore had waived the right to assert it on appeal. *Id.* Nevertheless, the court affirmed the

dismissal of the case based on the familiar principle that "courts will not strike down an

otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Id.* (quoting

*O'Brien*, 391 U.S. at 383). Judge Posner, writing for the court, explained that although inquiries

into legislative motive may be proper in some rare situations, the *O'Brien* rule "survives

undiminished in cases such as this where the statute or ordinance does not single out particular

individuals or groups for benefits or burdens and is not challenged as discrimination on invidious

grounds such as race, religion, and sex." *Id.* Because the challenged enactment "appeared to be

an utterly commonplace personnel regulation" that "[n]o outside observer . . . would suppose

[was] directed against the police or any other definable group," this suit did not fall within the narrow class of cases in which inquiry into legislative motive is permitted. *Id.* The court concluded that because evidence relating to the legislature's motive was inadmissible to prove a First Amendment violation, dismissal was warranted under Rule 12(b)(6).[8]

Plaintiffs raise two principal arguments in an attempt to avoid the reach of *O'Brien* and its progeny. First, Plaintiffs argue that Fourth Circuit law permits judicial scrutiny of legislative motives even when a statute is facially valid. To be sure, *O'Brien*'s prohibition on inquiring into legislative motives is subject to a few limited exceptions,[9] but Plaintiffs argue that cases like *Berkley v. Common Council of Charleston*, 63 F.3d 295 (4th Cir. 1995), and *Burtnick v. McLean*, 76 F.3d 611 (4th Cir. 1996), permit judicial examination of legislative motives in a much broader context. Plaintiffs misread these cases. *Berkley* and *Burtnick* both stand for the now well-recognized proposition that local government bodies do not possess absolute immunity from

---

[8] The *Hobart* court also identified two secondary grounds for affirming the district court's dismissal, both of which are equally applicable to the case at bar. First, Judge Posner explained that even assuming the challenged enactment did intend to punish the police for their support of opposition candidate, the tendency of politicians to favor their supporters and mulct their opponents simply amounts to "the characteristic operation and outcome of representative government," not a violation of First Amendment rights. *Id.* at 555. In short, the First Amendment "does not purge politics from politics," and courts are "reluctan[t] to suppose . . . that the First Amendment is properly understood to have banished political considerations from public employment." *Id.* Second, as a practical matter, accepting the plaintiffs' argument would "put at hazard a vast amount of routine legislation." *Id.* If every ordinary, facially constitutional budget enactment were suddenly subject to invalidation upon evidence that it intended to punish political opponents, "[t]he expansion of judicial review of legislation would be breathtaking." *Id.*

[9] The Supreme Court noted that an inquiry into legislative motive may be proper when "the very nature of the constitutional question requires an inquiry into legislative purpose," such as when a law is challenged as a bill of attainder. *O'Brien*, 391 U.S. at 383 n.30. The Fourth Circuit has further noted that an inquiry into legislative motive may also be appropriate in race or sex discrimination cases and in free speech cases "when the challenged legislation has on its face some content-based, *direct* inhibiting effect on freedom of speech." *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1259 & n.8 (4th Cir. 1989) (emphasis in original). Yet these exceptions apply only in "rare circumstances," *D.G. Rest.*, 953 F.2d at 147, and certainly are not implicated by the ordinary and general budgetary enactment at issue in this case.

suits brought under § 1983, and Defendants in this case do not dispute that a § 1983 claim against the County is theoretically possible.  (Defs.' Mem. at 12.)  Yet whether a legislature is immune from suit is quite a different question from whether, after the suit is filed, a court may rely on alleged improper legislative motives to strike down an otherwise valid statute.[10]  *Berkley* and *Burtnick* never reached this latter issue, and Plaintiffs' reliance upon them is unsound.

Second, Plaintiffs appear to argue that the Court need not inquire into legislative motives in the first place because the statements of certain government officials, standing alone, clearly establish the retaliatory nature of the challenged savings plan.  In particular, Plaintiffs make much of the fact that prior to the vote on the savings plan, Councilmember Elrich appeared to blame the LFRDs for the defeat of Bill 13-10 and expressed a desire to further cut their funding as apparent punishment for their opposition to the EMST fee.  (First Am. Compl. ¶ 21; Pls.' Opp'n at 9.)  The isolated comment of a single legislator, however, is insufficient to adequately state a First Amendment claim based on political retaliation.  Indeed, *O'Brien* involved a situation in which the statements of *three* legislators evinced an unconstitutional motive, and even then the Supreme Court upheld the challenged law because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Id.* at 384.  The Fourth Circuit echoes this rule: "The individual motives of legislators . . . are rarely relevant to a court's consideration of the legitimacy of the legislation.  For good reason, courts have not as a general rule found legislation unconstitutional based on the motive of the voting legislators when the legislation is facially constitutional."  *D.G. Rest. Corp.*, 953 F.2d at

---

[10] The Seventh Circuit's opinion in *City of Hobart* illustrates this distinction.  There, the court made an initial determination that members of the city council had waived the defense of legislative immunity and therefore could be sued under § 1983.  864 F.2d at 554.  Nevertheless, the court ultimately affirmed the dismissal of the complaint on the ground that courts cannot rely on legislative motives to overturn legislation that is otherwise constitutional.  *Id.*

146.  In sum, an alleged illicit legislative motive—even if articulated by one or more legislators—is insufficient to invalidate an otherwise constitutional and generally applicable statute.[11]

It is therefore clear that under the *O'Brien* line of cases, so long as Montgomery County's budget savings plan is otherwise constitutional, the existence of any alleged illicit legislative motive for enacting it is not a proper subject of judicial inquiry.  The obvious question then becomes whether the challenged savings plan is "otherwise constitutional."  Although Plaintiffs assert that the enactment was driven by an illicit retaliatory motive, there is no doubt that Defendants had the authority to pass the budget savings plan, and it appears to be a thoroughly ordinary cost savings measure.  Nothing about the enactment is facially unconstitutional, and it makes no distinctions on the basis of race, gender, religion, or any other invidious basis.  Moreover, the savings plan certainly is not "directed against the plaintiffs and no one else."  *See City of Hobart*, 864 F.2d at 556.  To the contrary, the funding cuts called for by the savings plan impact a broad range of departments and programs, including the Department of Transportation, the Police Department, the Public Libraries, and the Montgomery County Public Schools.  More specifically, although the savings plan authorizes spending cuts of over $32 million from the FY 2011 operating budget, only $592,000 of this total, or about 1.8%, came from the LFRDs'

_____

[11] Plaintiffs also contend that two excerpts from letters written by County Executive Leggett are similarly probative of the unconstitutionality of the savings plan.  In one excerpt, Leggett makes passing reference to "those whose actions have made these service cuts necessary."  (Pls.' Opp'n at 5, 10.)  In the other, Leggett states that the "volunteer leadership" had "worked against the public interest—and their own" by opposing the ambulance fee legislation (Pls.' Opp'n at 4.)  Plaintiffs' emphasis on these statements is curious.  The first statement is entirely ambiguous, as it is not even clear to whom Leggett is referring.  The second statement simply demonstrates an obvious difference of opinion about the EMST fee, a measure that Leggett believed would be beneficial to both the general public and the LFRDs.  Yet even assuming that these statements demonstrate some sort of animus towards Plaintiffs, they are insufficient to invalidate the challenged savings plan for the same reason that Councilmember Elrich's statement is irrelevant to this question.

administrative personnel budget.  (Pls.' Ex. 7, Budget Resolution No. 17-17: FY 2011 Savings

Plan.)  Far from being targeted specifically at Plaintiffs, the savings plan is instead "general in its

wording and impact."  *City of Hobart*, 864 F.2d at 556.  In sum, the challenged savings plan is

shown to be an ordinary, facially valid ordinance that neither discriminates on an invidious basis

nor singles out specific individuals or groups for burdens.  Consequently, under well-settled

constitutional principles, any inquiry into the legislative motive behind the statute is prohibited,

as courts "will not strike down an otherwise constitutional statute on the basis of an alleged illicit

legislative motive."  *O'Brien*, 391 U.S. at 383.

      B.     *Legislative Immunity*

Although I have already held that Plaintiffs have not stated a claim under the First

Amendment and Article 40, I also note that even if Plaintiffs could rely on alleged legislative

motives to challenge the savings plan, individual defendants Leggett and Bowers would still

possess legislative immunity from suit.  "Local legislators are entitled to absolute immunity from

§ 1983 liability for their legislative activities."  *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998).

Moreover, "officials outside the legislative branch are entitled to legislative immunity when they

perform legislative functions."  *Id.* at 55; *see also Marylanders for Fair Representation v.

Schaefer*, 144 F.R.D. 292, 298 (D. Md. 1992) ("It is the *function* of the government official that

determines whether or not he is entitled to legislative immunity, not his title.").  Whether a

particular act is legislative "turns on the nature of the act, rather than on the motive or intent of

the official performing it," and "legislative immunity attaches to all actions taken 'in the sphere

of legitimate legislative activity.'"  *Bogan*, 523 U.S. at 54 (quoting *Tenney v. Brandhove*, 341

U.S. 367, 376 (1951)).  Using this functional approach, the Supreme Court has held that a town

mayor was entitled to legislative immunity because his "introduction of a budget and signing into law an ordinance were formally legislative, even though he was an executive official." *Id.* at 55.

Although neither Leggett nor Bowers are elected legislators, their inclusion as named defendants in this case stems from actions that were legislative in nature. Leggett is named as a defendant because he proposed and submitted to the County Council the challenged budgetary legislation. (First Am. Compl. ¶¶ 11-12.) The Montgomery County Charter states that, as part of the budgetary process, the "County Executive shall submit to the Council . . . comprehensive six-year programs for public services and fiscal policy." Montgomery County, Md., Code § 302; *Haub v. Montgomery Cnty.*, 727 A.2d 369, 370 (Md. 1999). The County Code of Regulations further specifies that the County Executive must review the Fire Chief's budget recommendations and submit them to the County Council. COMCOR § 21-22(c). This is what Leggett did, just as he was required to do by County law. Obviously, then, his budget proposal was clearly within "the sphere of legitimate legislative activity." *Bogan*, 523 U.S. at 55. As such, Leggett possesses absolute immunity from suit on the basis of this budget proposal.

Bowers is named as a defendant because he gave allegedly misleading testimony during a session of the County Council just prior to the vote that approved the budget savings plan. (First Am. Compl. ¶ 20.) In *Bogan*, the Supreme Court reaffirmed that "legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan*, 523 U.S. at 54 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). In interpreting *Bogan*'s directive that "legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity," 523 U.S. at 54, courts have held that "speaking before a legislative body" is "of course" a type of legislative activity to which absolute immunity applies. *See Baraka v. McGreevey*, 481 F.3d

187, 196 (3d Cir. 2007); *cf. United States v. Johnson*, 383 U.S. 169, 184-85 (1966)).

Accordingly, the doctrine of legislative immunity likewise shields Bowers from suit in this case.

Plaintiffs contend, however, that Leggett and Bowers do not enjoy legislative immunity because their challenged actions were taken in their administrative capacities. Specifically, Plaintiffs assert that Bowers neglected his administrative responsibilities to "treat the LFRDs fairly and equally" and that Leggett authorized the cuts to LFRD funding "in his executive capacity, albeit rubbing up against the cloak of legislative immunity." (Pls.' Opp'n at 25.) Courts have emphatically rejected this so-called "backdoor approach" to interpreting the legislative immunity doctrine:

> [B]udgetmaking is a quintessential legislative function, reflecting the legislators' ordering of policy priorities in the face of limited financial resources. When budgets are cut materially in an industry as labor-intensive as that of local government, some people will almost surely lose their jobs. But that does not convert a budget cut into an "administrative" employment decision. . . . Almost all budget decisions have an effect on employment by either creating or eliminating positions or by raising or lowering salaries. This reality, however, does not transform a uniquely legislative function into an administrative one.

*Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988). I agree with the holding in *Rateree* and will not permit Plaintiffs to skirt the boundaries of the legislative immunity doctrine simply by reframing certain traditionally legislative acts as "administrative."[12] Accordingly, I find that absolute legislative immunity attaches to the actions taken by Bowers and Leggett in this case.

---

[12] Plaintiffs attempt to counter such clear precedent by citing *Carver v. Foerster*, 102 F.3d 96 (3d Cir. 1996), a case in which the Third Circuit held that a local government official could not assert a legislative immunity defense. The dispute in *Carver* centered around the official's "unilateral order to have [certain employees] fired," not a legislative enactment. This distinction is important, as *Carver*'s holding was limited to cases involving "conduct taken prior to and independent of legislative action." *Id.* at 102. Indeed, the Third Circuit expressly stated that because the case arose from actions completely divorced from the legislative context, its decision would not "open the floodgates for future plaintiffs wishing to attack legislators for their votes on controversial budgeting matters." *Id.* Consequently, *Carver* provides no support for Plaintiffs' position in this case.

III.    Abusive Discharge

In Count III, Plaintiffs allege that they suffered a "wrongful and abusive discharge from employment" at the hands of the County, Leggett, and Bowers.  (First Am. Compl. ¶ 43.) "Maryland does recognize a cause of action for abusive discharge by an employer of an at will employee when the motivation for the discharge contravenes some clear mandate of public policy."  *Adler v. Am. Standard Corp.*, 432 A.2d 464, 473 (Md. 1981).  "To state a claim for abusive or wrongful discharge, a plaintiff must allege that (1) she was discharged; (2) her discharge violated a clear mandate of public policy; and, (3) there is a nexus between the employee's conduct and the employer's decision to fire the employee."  *Miller v. Hamm*, CCB-10-243, 2011 U.S. Dist. LEXIS 141, at *40 (D. Md. Jan. 3, 2011).  I need not determine whether Plaintiffs have satisfied each of these elements, however, because the individual Plaintiffs were employees of the independent LFRDs, not the County.  Therefore, the County cannot be held liable on an abusive discharge claim.

The County Code of Regulations states that "[e]mployees of local fire and rescue departments who are paid with tax funds are not County employees."  COMCOR § 21-16(a). Moreover, the individual Plaintiffs were discharged by the independent LFRDs, not the County. (*See* Bowers Letter, Pls.' Ex. 3 [explaining that the County would not be funding administrative positions, but that each LFRD must "determine if the LFRD will retain your employee or effect a Reduction in Force (RIF)"; *see also* KVFD Termination Letter, Defs.' Ex. L ["your employment will be terminated at the close of business on February 11, 2011"].)  Plaintiffs nonetheless argue that they were "*de facto* dual employees" of the LFRDs and the County, pointing out that they held positions funded by the County, received pay and benefits comparable to those of County employees, and were entitled to the protections of the Montgomery County Personnel

Regulations.  (First Am. Compl. ¶ 8.)  The County Code of Regulations anticipates and expressly

forecloses such an argument:

> Nothing in this Chapter means that employees of the local fire and rescue
> departments are County employees, either on a *de jure* or *de facto* basis.  Nothing
> in this Chapter abrogates the authority of each local fire and rescue department
> over such functions are hiring, promotion, discipline, and discharge of employees
> of that department.

COMCOR § 21-16(c).

This case is also easily distinguishable from *Newell v. Runnels*, 967 A.2d 729 (Md.

2009), a case brought under the Fair Labor Standards Act ("FLSA") in which the court granted

"dual employee" status to the plaintiffs.  That holding was premised on the court giving the term

"employer" an "expansive interpretation in order to effectuate the FLSA's broad remedial

purposes."  *Id.* at 771.  Because the instant case does not involve the FLSA, and because

Plaintiffs have cited no authority suggesting that a similarly "expansive interpretation" of the

term "employer" is warranted for abusive discharge claims, *Newell*'s holding has only limited

relevance to the facts of this case.[13]  In sum, I hold that the County was not the Plaintiffs'

employer, dual or otherwise, and so Plaintiffs have not stated a claim upon which relief can be

granted.

---

[13] Plaintiffs also argue that the tort of abusive discharge was designed to compensate
injured plaintiffs when no administrative remedy was available.  They report that they recently
lost at an administrative hearing when the Merit System Protection Board ruled that they were
"foreclosed from any administrative relief against the County," and so they contend that their
failure to obtain administrative relief "trigger[s] the application of a tort remedy to address the
wrongs" they have suffered.  (Pls.' Opp'n at 29.)  Of course, regardless of Plaintiffs' ability to
obtain administrative relief, they cannot prevail on their abusive discharge claim unless they can
establish that Defendants are liable.  As discussed above, however, Defendants were not the
employers of Plaintiffs, and so Plaintiffs cannot pursue an abusive discharge claim against them.

IV.     Reduction in Force Regulations

In Count I, Plaintiffs assert a claim against Defendants for failure to comply with the reduction in force ("RIF") procedures set forth in Section 30 of the Montgomery County Personnel Regulations ("MCPR").  In Count V, Plaintiffs seek a writ of mandamus compelling Defendants to comply with the RIF procedures set forth in the MCPR.  These claims fail for the same reason as the abusive discharge claim—namely, that Plaintiffs are employees of the independent LFRDs, not the County.  Accordingly, it is the LFRDs who therefore must comply with the provisions set forth in Section 30 of the MCPR, as they were the entity enacting the RIF. Indeed, this fact apparently was understood by both parties at the time of the RIF.  Soon after the budget cuts were announced, Bowers sent a letter to LFRD leaders encouraging them to "reference Section 30 of the [MCPR] to process a RIF, if your LFRD elects to take this course of action."  (Bowers Letter, Pls.' Ex. 3.)  Likewise, at least one LFRD acknowledged that it was bound by Section 30's RIF requirements in a termination letter sent to its employee: "the Montgomery County Personnel Regulations, Section 30-9 require KVFD to notify you that your employment will be terminated."  (KVFD Termination Letter, Defs.' Ex. L.)  For these reasons, Plaintiffs fail to state a claim against Defendants under Section 30's RIF requirements.

CONCLUSION

Because I find that Plaintiffs have failed to state a claim against Defendants, I will grant Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  A separate order implementing this judgment is being entered herewith.


Date:  May 31, 2011                          _____/s/_____
                                             J. Frederick Motz
                                             United States District Judge